IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS DART, SHERIFF OF COOK COUNTY, | ) ) | |
| | ) | Judge John F. Grady |
| Plaintiff | ) ) | |
| v. | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| CRAIGSLIST, INC. | ) | Case No. 09 CV 1385 |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
CRAIGSLIST'S MOTION FOR JUDGMENT ON THE PLEADINGS**

*Counsel for craigslist, Inc.*

Eric D. Brandfonbrener
Kathleen A. Stetsko
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL  60603
Tel:  (312) 324-8400

Patrick J. Carome
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Tel:  (202) 663-6000

# Table of Contents

Page

BACKGROUND ........................................................................................................ 2

   The craigslist Website ............................................................................................ 2

   The Problem of Illegal Prostitution and the Internet ......................................... 4

   The Sheriff's Complaint ........................................................................................ 7

   Procedural Posture ................................................................................................ 9

ARGUMENT ............................................................................................................. 9

   I.     Section 230 Immunizes craigslist from Liability in This Case ............................ 9

         A.     Appellate Decisions in the Seventh and Other Circuits Establish That Section 230 Immunizes Service Providers from Liability for Third-Party Content ................................................................... 10

         B.     The Three Elements for Section 230 Immunity Are Met Here .............. 13

         C.     Permitting Plaintiff's Claims To Proceed Would Defeat the Two Public Policy Objectives of Section 230 ................................................. 17

   II.    Plaintiffs' Proposed Remedies Are Barred as a Matter of Law .......................... 20

         A.     Plaintiff's Expenditure of Costs Is Not a Tort Injury That Can Be Redressed With Damages ........................................................... 20

             1.  Plaintiff's Costs Are Solely Economic Losses .................................... 21

             2.  Plaintiff's Costs Are Expenditures on Municipal Services ................. 22

         B.     The Requested Injunction Would Be an Unconstitutional Prior Restraint ................................................................................... 23

CONCLUSION ......................................................................................................... 25

## Cases

*Alexander v. United States*,
509 U.S. 544 (1993) ............................................................................. 23

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980) ............................................................................. 17

*Associated Bank-Corp. v. Earthlink, Inc.*,
2005 WL 2240952 (W.D. Wis. 2005) ................................................. 11

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ....................................................... 18, 19

*Ben Ezra, Weinstein, & Co. v. America Online, Inc.*,
206 F.3d 980 (10th Cir. 2000) ............................................... 10, 13, 16

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ............................................... 10, 15, 18

*CBS v. Davis*,
510 U.S. 1315 (1994) ..................................................................... 23, 24

*Center for Democracy & Technology v. Pappert*,
337 F. Supp. 2d 606 (E.D. Pa. 2004) ................................................. 25

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. craigslist, Inc.*,
519 F. 3d 666 (7th Cir. 2008) ........................................................ 11-14

*City of Chicago v. Beretta USA*,
821 N.E.2d 1099 (Ill. 2004) ........................................................... 21-23

*Collins v. Jordan*,
110 F.3d 1363 (9th Cir. 1996) ............................................................ 24

*Cubby, Inc. v. CompuServe, Inc.*,
776 F.Supp. 135 (S.D.N.Y. 1991) ..................................................... 19

*Doe v GTE*,
347 F.3d 655 (7th Cir. 2003) .............................................................. 23

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ........................................................ 10, 16

*Doe v. SexSearch.Com*,
502 F.Supp.2d 719 (N.D. Ohio 2007), *aff'd on other grds.*, 551 F.3d 412 (6th Cir. 2008) 11, 17

*Fair Housing Council v. Roommates.com*,
521 F.3d 1157 (9th Cir. 2008) *(en banc)* ...................................... 12-14

*Gentry v. eBay, Inc.*,
99 Cal.App.4th 816 (2002) ................................................................. 15

*Goddard v. Google, Inc.*,
2008 WL 5245490 (N.D. Cal. 2008) ................................................. 11

**Table of Contents**
(continued)

*Green v. America Online, Inc.*,
   318 F.3d 465 (3d Cir. 2003) ............................................................. 10, 14, 16

*Henson v. CSC Credit Servs.*,
   29 F.3d 280 (7th Cir. 1994) ............................................................. 4

*In re Chicago Flood Litigation*,
   680 N.E.2d 265 (Ill. 1997) ............................................................. 21, 22

*In re Illinois Bell Switching Station Litig.*,
   641 N.E.2d 440 (Ill. 1994) ............................................................. 21

*Morrison v. America Online, Inc.*,
   153 F. Supp. 2d 930 (N.D. Ind. 2001) ............................................................. 11

*National Ass'n of Realtors v. National Real Estate Ass'n*,
   894 F.2d 937 (7th Cir. 1990) ............................................................. 20

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ............................................................. 23-25

*Nebraska Press Assoc. v. Stuart*,
   427 U.S. 539 (1976) ............................................................. 23-24

*New York Times Co. v. U.S.*,
   403 U. S. 713 (1971) (*per curiam*) ............................................................. 24

*Organization for a Better Austin v. Keefe*,
   402 U.S. 415 (1971) ............................................................. 23

*Reno v. Amer. Civil Liberties Union*,
   521 U.S. 844 (1997) ............................................................. 25

*Smith v. California*,
   361 U.S. 147 (1959) ............................................................. 19

*Southeastern Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ............................................................. 23

*U.S. v. Evans*,
   994 F.2d 317 (7th Cir. 1993) ............................................................. 4

*U.S. v. Henderson*,
   580 F.Supp.2d 669 (N.D. Ill. 2008) ............................................................. 4

*Universal Communication Systems, Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) ............................................................. 10, 13, 14, 17

*Weinberg v. City of Chicago*,
   310 F.3d 1029 (7th Cir. 2002) ............................................................. 23

*Whitney Information Network, Inc. v. Xcentric Ventures, LLC*,
   2008 WL 450095 (M.D. Fla. 2008) ............................................................. 11, 15

# Table of Contents
## (continued)

*Zeran v. America Online, Inc.,*
129 F.3d 327 (4th Cir. 1997) .................................................................... passim

**Statutes**

18 U.S.C. § 1952 .................................................................................................... 7

42 U.S.C. § 3604(a) ............................................................................................ 11

47 U.S.C. § 230 ............................................................................................. passim

47 U.S.C. § 230(a)(3)-(4) .................................................................................. 18

47 U.S.C. § 230(b)(2) ......................................................................................... 18

47 U.S.C. § 230(c) .............................................................................................. 10

47 U.S.C. § 230(c)(1) .................................................................................... 10, 13

47 U.S.C. § 230(e)(1) ......................................................................................... 17

47 U.S.C. § 230(e)(2) ......................................................................................... 17

47 U.S.C. § 230(e)(4) ......................................................................................... 17

47 U.S.C. § 230(f)(2) .......................................................................................... 14

47 U.S.C. § 230(f)(3) .......................................................................................... 14

720 ILCS 5/11 14(a) ............................................................................................. 6

**Other Authorities**

141 Cong. Rec. 22,045 (1995) ........................................................................... 19

H.R. Rep. No. 107-449,
(2002) ............................................................................................................ 11

C Wright & A. Miller, 5C *Federal Practice & Procedure,* § 1386 ....................... 9

Rather than using traditional law enforcement tactics to pursue those actually involved in prostitution and related crimes, Plaintiff Thomas Dart, the Sheriff of Cook County, has instead retained a private law firm to bring this civil action against craigslist, Inc. ("craigslist"). craigslist operates a popular Internet classifieds service used by tens of millions of Americans each month, free of charge, to find employment, housing, goods and services, friendship, romance, and local community information. Although used overwhelmingly by well-intentioned law-abiding citizens, like any means of communication, the craigslist website can be abused by third-parties in connection with crimes including prostitution, despite craigslist's best efforts to prevent crimes from occurring. The Plaintiff seeks to hold craigslist liable, on a state law public nuisance theory, for these third parties' unlawful conduct.

Plaintiff asks this Court for two forms of relief: (1) damages to cover routine law enforcement costs allegedly incurred by the Sheriff's Department in connection with arrests of persons caught pursuant to "stings" allegedly arranged through the craigslist website; and (2) a permanent injunction compelling craigslist to "close" a subcategory of the website, called "erotic," where Plaintiff alleges that unnamed third parties seeking to engage in prostitution post ads. Plaintiff advances these claims even though it is plain, on the face of his Complaint, that craigslist employs a variety of measures designed to discourage, prevent, and remove such ads from its website.

Even assuming that all of the facts alleged in the Complaint are true, it is clear *as a matter of law* that judgment must be entered in favor of craigslist. *First*, while Plaintiff may use his Department to pursue those who exchange sex for money in Cook County, his claims (assuming for this motion that he can assert them in this manner) against craigslist are barred by a federal statute, 47 U.S.C. § 230 ("Section 230"). Courts across the country, including the

Court of Appeals for this Circuit in a case *against craigslist*, uniformly have held that Section 230 broadly protects online service providers from suits seeking to impose liability on them for harmful and/or unlawful communications that originate from the users of the services. That is precisely what Plaintiff's suit seeks to do, and it therefore must be dismissed.

*Second*, dismissal is also required for the independent reason that the relief sought by the Complaint is barred as a matter of law. The Complaint's claim for monetary relief is facially invalid because Illinois law precludes a governmental party, such as a Sheriff, from suing in tort to recover the costs of providing police and law enforcement services. Likewise, the injunctive relief sought by the Complaint — namely an order that craigslist "close" a portion of its website — violates the First Amendment's strong presumption against prior restraints on future speech.

For these reasons, craigslist is, as a matter of law, entitled to judgment on the pleadings.

## **BACKGROUND**

The craigslist Website

craigslist operates a website (www.craigslist.org) dedicated to local community classifieds and forums, on which users place ads, share ideas, and find things they need in their lives, including jobs, romance, used goods, social activities, local community information, and housing. *See* Cmplt. at ¶¶ 10-11. The classified ads and other postings available on the craigslist website are created entirely by the site's users. In other words, the people who use the website write the material that they post. *Id.* at ¶ 11. Users have a choice of categories and subcategories on the website within which to post an ad or notice, including "community," "personals," "discussion forums," "housing," "for sale," "services," and "jobs." *Id.* at Exs. A & B.

The number of people who place and read postings on the craigslist website, and the sheer volume of information that users thereby exchange, is staggering. According to the Complaint,

the website "is visited by more than 40 million Americans each month (*id.* at Ex. L), and those users generate many *billions* of "page views" each month. *See id.* ("more than 12 billion monthly page views"); *id.* at ¶ 15 (site "viewed over nine billion times each month"). Users create and post "over thirty million new classified advertisements each month." *Id.* at ¶ 14.

In general, users of the website do not pay to post an ad or notice. The exceptions are job ads in certain cities and broker apartment listings in New York City, for which a per-ad posting fee is charged.[1] These fees are, according to the Complaint, craigslist's "sole source of revenue." *Id.* at ¶ 13. The postings on the craigslist website may be viewed entirely for free by any person with Internet access. Unlike nearly all other highly popular websites, craigslist does not sell or display banner, display or textual advertisements on its website. *Id.* at ¶ 14.

All usage of the craigslist website is subject to craigslist's detailed Terms of Use, which are readily available to all users through prominently displayed links throughout the site.[2] To post any ad, a user must first affirmatively declare his or her acceptance of these Terms of Use by clicking an "ACCEPT" button located below a full-text display of the agreement. *See* fn 2. Among other things, these Terms of Use explicitly prohibit the posting or making available of any content that is "unlawful" or that "advertises any illegal service," including in particular "any offer or solicitation of illegal prostitution."[3] To promote compliance with its Terms of Use, craigslist employs various self-regulatory measures, including an automated filter that blocks ads

---

[1]     As noted below, another exception is now the "erotic services" subcategory, for which craigslist has, since late 2008, charged a nominal fee — that must be paid using a valid credit card — in order to make it easier for law enforcement officials to identify and apprehend any user who posts an ad for unlawful activity. craigslist added this fee as part of its continuing efforts to discourage unlawful conduct that violates its Terms of Use. Net proceeds from this fee will be donated to charity. *See* Cmplt. at Ex. L.

[2]     *See* Cmplt. at Exs. A, B & C (each showing link to craigslist's Terms of Use, http://www. craigslist.org/about/ terms.of.use); *see also* craigslist's Answer at ¶ 18 & Ex. 1 (copy of craigslist Terms of Use, including screenshot showing "ACCEPT the terms of use" button).

[3]     *See* Cmplt. at Ex. A; *see also* craigslist Answer at ¶ 18 & Ex. 1 (Terms of Use) at §§ 7(a) & 7(n); *id.* at ¶¶ 18, 24 & Exs. 3, 5 and 7 (additional warnings from the website prohibiting postings for prostitution).

that contain words or phrases that are associated with problematic content and a community flagging system that encourages users to "flag" inappropriate ads for removal. *See* Cmplt. at Ex. L; *see also* craigslist's Answer at ¶ 46 & Ex. 8.

One of the subcategories of the "services" section of the craigslist website is titled "erotic." Cmplt. at Ex. A. craigslist introduced this subcategory several years ago at the request of users, so that legal escort services, massage workers, exotic dancers, and others whose ads often contain adult content (and who advertise in many other media outlets in Chicago and elsewhere) would have a dedicated area in which to post their ads. *See* Cmplt. at Ex. C; *see also* craigslist's Answer at Ex. 7 (copy of printout of page for which link is shown on Cmplt. Ex. C).

<u>The Problem of Illegal Prostitution and the Internet</u>

The crime of prostitution has undoubtedly long existed within Cook County, Illinois. The Complaint, of course, makes no suggestion that criminal prostitution was not a problem before the relatively recent advent of Internet communications services. Nor does it allege that the overall level of illegal prostitution activity in Cook County has increased since craiglist established an online forum for the greater Chicago community,[4] or that such activity would decrease, much less disappear, if craigslist were to shut down all or any part of this forum.

As forty state Attorneys General recently declared in a joint statement attached (in part) to the Complaint, "[l]ike all communications tools, [the craigslist web site] can unfortunately be misused to facilitate unlawful activity." Cmplt. at Ex. :L; *see also* craigslist Answer at Ex. 8

---

[4]     Plaintiff obliquely references "a surge in prostitution arrests" that he "attributes . . . to the popularity and accessibility" of the "erotic services" subcategory on the craigslist website. Cmplt. at ¶ 133. In fact, the total number of such arrests that the Complaint attributes to postings on the craigslist website (200 since January 2007 or about 85 per year — *id*. at ¶ 58) pales in comparison to prostitution arrests by the City of Chicago (4,600 in 2006; 4,000 in 2007 — *see* Ex. A hereto (excerpt of Chicago Police Department, *2007 Annual Report*)). This Court may properly take judicial notice of such matters of public record without converting this 12(c) motion into a summary judgment motion. *See Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir. 1994); *U.S. v. Evans,* 994 F.2d 317, 322 n. 1 (7th Cir. 1993) *U.S. v. Henderson*, 580 F.Supp.2d 669, 670 n. 1 (N.D.Ill. 2008).

4

(complete copy of Joint Stmt.). Over time, craigslist has put in place various measures to try to prevent abuse of its website, including abuse by wrongdoers who, in violation of craigslist's Terms of Use, post ads to the website's erotic services subcategory that may offer or solicit prostitution.[5] More recently, working with state law enforcement officials, craigslist voluntarily developed and implemented special pre-posting procedures for the erotic subcategory to discourage abuse of the website and to make it easier for law enforcement to identify and apprehend wrongdoers engaged in prostitution. *Id.*[6] Plaintiff Dart was not included in these discussions and now publicly dismisses these efforts as ineffective. *Id.* at ¶ 50. Rather than recognize that those who are engaged in prostitution who advertise on craigslist are abusing the website, Plaintiff blames craigslist.

Plaintiff particularly faults craigslist for having an erotic subcategory, claiming it "facilitates" prostitution. *See, e.g., id.* at ¶ 100. Although the text of the Complaint eschews any discussion of why craigslist introduced this subcategory,[7] material from the website itself — which the Complaint attaches and/or cites — shows that craigslist did this to provide a specially

---

[5]    For example, craigslist prominently displays warnings within the erotic subcategory — including an explicit instruction that advertising for prostitution is unlawful and prohibited. Cmplt. at Ex. C. Any person posting to this subcategory also must, among other things, repeatedly agree that they are not advertising for illegal services, will post only lawful content, and have otherwise agreed to comply with the website's Terms of Use. *See* craigslist Answer at ¶ 67 & Ex. 9 (copies of webpages from the posting process). In addition, other special measures for this subcategory include an alert about the adult nature of the content; a specific direction to users to flag as "prohibited" — and therefore for removal — any ad soliciting prostitution; a ban on "entry" to this subcategory by anyone under the age of 18; and an optional mechanism that allows parents and others to employ widely available content-filtering technology to block this subcategory from their computers. *See* Cmplt. at Ex. C; *see also* craigslist Answer at ¶¶ 18, 24 & Exs. 5 & 7 (further warnings on and measures taken by the website).

[6]    Among other things, craigslist last year implemented requirements that anyone posting to this subcategory both provide a working telephone number and pay a nominal fee using a valid credit card. Cmplt. at Ex. L. These procedures are designed to create an electronic trail back to the poster which law enforcement agencies may obtain when investigating criminal activity. These procedures are also intended to discourage those who are in fact engaging in unlawful conduct from posting on craigslist in the first instance. *Id.* Net revenue from the special posting fee will go to charity. *Id.*

[7]    The Complaint explicitly concedes that craigslist does not profit from postings made to the erotic subcategory. Cmplt. at ¶ 37.

zoned area for a class of lawful ads that users previously were posting to craigslist's regular "personal" categories or other categories or subcategories.[8] Having this separate subcategory insulates those in the community who are not interested in reading such ads. It also allows craigslist to target special deterrent measures at persons who post ads of this nature. *See* fn 5 & 6, *supra*. Eliminating the erotic subcategory, as Plaintiff requests, would deprive those wishing to place legitimate ads in a segregated and more controlled space the ability to do so, inevitably leading to a recurrence of some users posting such ads to other categories, and likely make it more difficult and costly for law enforcement to identify and arrest criminals who abuse the craigslist website to communicate about prostitution and related unlawful behavior.[9]

While the Complaint generally alleges that "[m]ost posts in the erotic services forum clearly provide for prostitution" (Cmplt. at ¶ 30), it sets forth the actual content of only twelve user postings. *Id.* at ¶ 32 & Ex. E. This sampling, which the Complaint characterizes as "openly promis[ing] sex for money (*id.* at ¶ 17), was culled from many thousands of ads that craigslist users posted to that particular subcategory during January 2009. *See id.* at ¶ 33 (alleging rate of new postings is "inexorable" and that "Chicago erotic services [subcategory] collects over 300

---

[8]    *See* Cmplt. Ex. C (showing link to background (or FAQ) on the erotic subcategory); Ex. X (letter from craigslist); craigslist Answer at ¶ 24 & Ex. 7 (printout of FAQ from website).

[9]    While the Complaint insinuates that the mere phrase "erotic services" automatically denotes prostitution, the common meaning of "erotic" encompasses a wide range of lawful activity. Merriam-Webster online dictionary (available at http://www.merriam-webster.com) defines "erotic" as "1: of, devoted to, or tending to arouse sexual love or desire [and] 2 : strongly marked or affected by sexual desire." Certainly there is plenty of conduct that may be erotic without remotely approaching conduct that would constitute prostitution. *See* 720 ILCS 5/11-14(a) (defining prostitution as necessarily including either (a) "any act of sexual penetration as defined in Section 12-12 of this Code" or (b) "any touching or fondling of the sex organs of one person by another person . . . for the purpose of sexual arousal or gratification" for money or payment of something of value).

posts per day").[10] The Complaint does not allege that the Sheriff's Department or anyone else conducted any investigation into any of the postings at issue; that any craigslist user ever responded to any of these postings; or that the availability of any of these postings on the craigslist website resulted in any actual or attempted unlawful exchange of sex for money, much less any arrest.

Plaintiff alleges that other ads posted in the erotic subcategory – none of which is quoted or attached to the Complaint — led to arrests by the Sheriff's Department. Cmplt. at ¶¶ 57-68 & Ex. W. Specifically, he asserts that over a 27 month period (January 2007 to March 2009), an unspecified number of "sting" operations, prompted by an unspecified number of ads posted on the craigslist website, led to arrests of over 200 people on prostitution or related charges. *Id.* at ¶¶ 57-58. While the Complaint implies that many of these arrests stemmed from ads posted by third-parties, others apparently resulted from "fake advertisements" posted by the Sheriff's Department itself. *Id.* at ¶¶ 67-68. The Complaint is notably silent about how many of the Sheriff's Department's prostitution arrests resulted in convictions.

The Sheriff's Complaint

Plaintiff purports to assert a "public nuisance" tort claim against craigslist for "knowingly and intentionally facilitat[ing]" the "public nuisance" of prostitution. Cmplt. at ¶¶ 58-86. In an effort to flesh out this claim, he asserts that craigslist's provision of an online communications

_____

[10]   With respect to at least some of these hand-picked examples, it is not obvious that whatever the poster was offering included sexual activity sufficient to support a charge of unlawful prostitution, as opposed to some sort of legal escort, companionship, exotic dancing or massage service. *See, e.g.,* Cmplt. at ¶ 32.H (ad offering services of a 24 year old man as escort; "I will go out with you for a night in town, I will be your boyfriend for the night.  I'll go to a wedding with you or clubbing or even strip for a bachelorette party or just for you or a group of girls"); *id.* at ¶ 32.L. (ad seeking women to work as nannies for single fathers; "Ever fantasized about being a hot young sexy nanny for an attractive man and his children?").  Rather, to effect any arrest, the Sheriff's Department must perform a "sting" in which officers pose as customers responding to ads, arrange meetings with the posters through multiple phone calls, and then make arrests only after offers of sex for money are made. *See id.* at ¶¶ 64, 75 & Ex. W.

forum that includes an erotic subcategory necessarily violates three codified laws. Specifically, he alleges that providing such a forum constitutes (a) racketeering activity prohibited by the federal RICO statute, 18 U.S.C. § 1952 (which presumes an intent to violate, and a violation of, state prostitution laws), (b) intentional "direct[ing] [of] another to a place knowing such direction is for the purpose of prostitution" in violation of 720 ILCS 5/11-15, and (c) "knowingly . . . direct[ing] . . . any person for immoral purposes to" prostitutes, in a violation of Chicago Municipal Code 8-8-020.

Plaintiff's theory is *not* that craigslist is the author or source of any advertisement that proposed or lead to prostitution. As the Complaint itself makes clear, all such ads were created and posted by persons who use the craigslist website as a forum to reach others. *See, e.g., id.* at ¶ 11. Instead, Plaintiff's theory is that the act of establishing an online forum that includes an "erotic" subcategory that is abused by some users (against the stated policies of the service provider) to advertise unlawful activities, is sufficient to make the service provider liable, on grounds of public nuisance, for all the harms that may flow from those users' ensuing crimes.

Plaintiff claims that craigslist's conduct constitutes an injury in fact to him personally. *Id.* at ¶ 138. He seeks to recover the costs purportedly incurred by the Sheriff's Department in "abating" the nuisance allegedly created by craigslist. *Id.* at ¶ 26. A "cost analysis" attached to the Complaint purports to estimate the cost of 156 such arrests that the Department allegedly made between January and November 2008 at $105,081. *Id.* at ¶ 78 & Ex. W. That figure represents the Sheriff Department's assumed "manpower" commitment of 20 hours per arrest for performing the following tasks: "[s]urf . . . the 'Erotic Section'" to find an ad to investigate, three phone calls to arrange a meeting, "[m]eet the actual call girl or escort," "[a]ffect [sic] the arrest,"

"[p]rocess [the] arrestee," "paperwork," and "[a]ttend court hearing." *Id.*[11] Plaintiff does not

address whether any of these "manpower" costs would have been incurred in any event — for

example, investigating other prostitution activity, or on some other department business — if the

craigslist Chicago forum did not exist. Plaintiff's prayer for relief also requests the entry of a

vague permanent injunction enjoining craigslist "from engaging in the conduct complained of

herein," *id.* at p. 27; in the body of the Complaint, however, he alleges that he "seeks to close

only the erotic services section of Craigslist." *Id.* at ¶ 2.

Procedural Posture

In addition to the present Motion, craigslist has simultaneously filed an Answer. The

Answer denies most of the factual allegations of the Complaint, denies that craigslist has any

liability to Plaintiff, and asserts a number of additional legal and factual defenses. This Motion,

however, assumes for the sake of argument that the allegations of the Complaint are true, and

establishes nevertheless that Plaintiff's claim is barred in its entirety by federal statute, 47 U.S.C.

§ 230 and that dismissal is independently required because the relief that Plaintiff seeks is

unavailable as a matter of the law of Illinois and the First Amendment to the U.S. Constitution.[12]

**ARGUMENT**

I.     **Section 230 Immunizes craigslist from Liability in this Case.**

Judicial precedent from the Seventh and other Circuits specifically holds that 47 U.S.C.

§ 230 ("Section 230") precludes imposing liability on an entity such as craigslist for allegedly

---

[11]     The $105,081 figure represents approximately 0.02% of the Sheriff's Department's $420 million 2008 annual budget. *See* Ex. B hereto (excerpt of Cook County Dept. of Budget and Management Services, *2009 Annual Appropriation Executive Budget Recommendation,* vol. III, dated as of 12/17/08, available at www.cook.il.us); *see also* fn 4.

[12]     *See* C. Wright & A. Miller, 5C *Federal Practice and Procedure,* at § 1368 (under Rule 12(c), while factual allegations of adversary's pleading are taken as true, movant does not concede assertions that constitute conclusions of law, legally impossible facts, facts which would be inadmissible, or facts which appear by a record or document included in the pleadings to be unfounded).

unlawful postings originated by a third party. Because the elements of that immunity are

unquestionably satisfied here, Section 230 requires dismissal of Plaintiff's claims.

A. **Appellate Decisions in the Seventh and Other Circuits Establish That Section 230 Immunizes Service Providers from Liability for Third-Party Content.**

The key operative provision of Section 230 provides that "[n]o provider or user of an

interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider." 47 U.S.C. § 230(c)(1).[13] As the Ninth

Circuit has noted, there is a "consensus developing across other courts of appeal that § 230(c)

provides broad immunity for publishing content provided primarily by third parties." *Carafano*

*v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *see also Doe v. MySpace, Inc.*,

528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230

broadly in all cases arising from the publication of user-generated content"); *Zeran v. America*

*Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997) ("Section 230 . . . plainly immunizes computer

service providers like AOL from liability for information that originates with third parties");

*Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003) ("By its terms, § 230 provides

immunity to AOL as a publisher or speaker of information originating from another information

content provider"); *Ben Ezra, Weinstein, & Co., v. America Online, Inc.*, 206 F.3d 980, 984-85

(10th Cir. 2000) (§ 230 "creates a federal immunity to any state law cause of action that would

hold computer service providers liable for information originating with a third-party"); *Universal*

*Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); ("[W]e too find

that Section 230 immunity should be broadly construed").

Countless federal district courts and state appellate and trial-level courts also have

concluded that § 230 broadly immunizes providers of interactive computer services from liability

---

[13] Section 230(e)(3) further provides: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

for the dissemination of third-party content.[14]  Congress itself, in enacting legislation extending

the reach of § 230 to a new category of service providers, has explicitly observed that "[t]he

courts have correctly interpreted section 230(c)."  H.R. Rep. No. 107-449, at 13 (2002).

The Seventh Circuit has recently joined this judicial consensus in *Chicago Lawyers'*

*Committee for Civil Rights Under Law, Inc. v. craigslist, Inc.*, 519 F. 3d 666 (7th Cir. 2008)

("CLC").  Significantly, the Seventh Circuit specifically held that under Section 230 *craigslist*

*itself* may not be held liable for its users' allegedly unlawful postings.  There is no material

distinction between the facts alleged in the CLC's dismissed complaint and Plaintiff's Complaint.

The CLC sought to hold craigslist liable under the Fair Housing Act, 42 U.S.C.

§ 3604(a), for allegedly discriminatory housing ads posted by users on the craigslist website.  In

affirming dismissal, the Seventh Circuit (Easterbrook, J.) noted that services like craigslist are, in

many respects, "like common carriers such as telephone services" — they do not read the

messages they transmit on their systems.  519 F.3d at 668.  The Court recognized that requiring

craigslist to review each ad, such as the CLC demanded in that case and Plaintiff effectively

demands here, is neither practical nor effective.  *Id.* at 669.  The Seventh Circuit further

concluded that craigslist was not obligated to review the ads, because Section 230 immunized

craigslist from liability for the ads.  Regardless of how the CLC characterized its action, it was

seeking to hold craigslist liable for publishing the ads at issue in that case.  *Id.* at 671.  Indeed, in

an analysis directly applicable to Plaintiff's Complaint, the Seventh Circuit rejected the CLC's

argument that craigslist should be held liable for causing the unlawful postings:

---

[14]    *See, e.g., Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D. Cal. 2008); *Whitney Information Network, Inc., v. XCentric Ventures, LLC*, 2008 WL 450095 (M.D. Fla. 2008); *Doe v. SexSearch.Com*, 502 F.Supp.2d 719 (N.D. Ohio 2007), *aff'd on other grounds* 551 F.3d 412 (6th Cir. 2008); *Associated Bank-Corp. v. Earthlink, Inc.*, 2005 WL 2240952, at *4 (W.D. Wis. Sept. 13, 2005); *Morrison v. America Online, Inc.*, 153 F. Supp. 2d 930, 932-34 (N.D. Ind. 2001).

Doubtless craigslist plays a causal role in the sense that no one could post a discriminatory ad if craigslist did not offer a forum. That is not, however, a useful definition of cause. One might as well say that people who save money "cause" bank robbery, because if there were no banks there could be no bank robberies. An interactive computer service "causes" postings only in the sense of providing a place where people can post. Causation in a statute such as [the Fair Housing Act] must refer to causing a particular statement to be made, or perhaps the discriminatory content of a statement. That's the sense in which a non-publisher can cause a discriminatory ad, while one who causes the forbidden content may not be a publisher. Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination; . . . . If craigslist "causes" the discriminatory notices, then so do phone companies and courier services (and, for that matter, the firms that make the computers and software that owners use to post their notices online), yet no one could think that Microsoft and Dell are liable for "causing" discriminatory advertisements.

*Id.* at 671-72. The Seventh Circuit thus held that "given § 230(c)(1) [the CLC] cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful [conduct]" *Id.* at 672. The same conclusion applies here.

The Ninth Circuit's *en banc* decision in *Fair Housing Council v. Roommates.com*, 521 F.3d. 1157, 1174 (9th Cir. 2008) (en banc), issued after the Seventh Circuit's *CLC* decision, also directly and unequivocally holds that a website operator may not be liable for unlawful ads posted by its users, except in circumstances (not present here) where the website operator structures its site so as to directly and necessarily cause its users to include unlawful statements in their postings. In *Roommates.com*, a portion of the website at issue required users to answer multiple choice questions that necessarily led to the generation of unlawful content (i.e., statements of unlawful preferences in housing ads). *Id.* at 1165. The website also included an open-ended "Additional Comments" feature in which users could include content, some of which also was allegedly unlawful. While the court held that Section 230 did not immunize Roommates.com with respect to the allegedly unlawful content dictated by the multiple choice questions, all eleven members of the *en banc* court expressly held that everything that users chose to include in the "Additional Comments" section was created and developed entirely by

the users themselves and that Section 230(c)(1) accordingly immunized the site operator from

liability for any unlawful preferences expressed in that section. *Id.* at 1174-75.

The craigslist website includes nothing whatsoever to cause its users to include unlawful

statements in postings or otherwise to engage in unlawful conduct — rather craigslist simply

provides its users with a blank text box in which to describe their offered services. In this

respect, the craigslist site functions just like the open-ended "Additional Comments" feature of

the Roommate.com website. Indeed, Chief Judge Kozinski's opinion in *Roommate.com*

specifically equates craigslist's functionality with the "Additional Comments" section of

Roommate.com's website, and explicitly endorses the Seventh Circuit's conclusion that Section

230(c)(1) fully protects craigslist from liability for the content of its users' postings:

> In *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. craigslist, Inc.*, . . . the Seventh Circuit held the online classified website craigslist immune from liability for discriminatory housing advertisements submitted by users. Craigslist's service works very much like the "Additional Comments" section of the Roommate's website, in that users are given an open text prompt in which to enter any description of the rental property without any structure imposed on their content or any requirement to enter discriminatory information: Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination . . .." [internal cites to 519 F.3d at 671-72 omitted].

*Fair Housing Council*, 521 F.3d at 1172, n. 33.

## B.    The Three Elements for Section 230 Immunity Are Met Here.

Section 230 immunity exists whenever (1) the defendant claiming immunity is "a

provider ... of an interactive computer service," (2) the allegedly unlawful content was "provided

by another information content provider," and (3) the plaintiff's claims seek to "treat[]" the

defendant as the "publisher or speaker" of that information. 47 U.S.C. § 230(c)(1); *see generally*

*Ben Ezra*, 206 F.3d at 984-85; *Lycos, Inc.*, 478 F.3d at 418. Each element is satisfied here.

*First*, craigslist is a "provider" of an "interactive computer service." Under Section 230,

an "interactive computer service" means "*any* information service, system, or access software

provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). craigslist is a provider of an interactive computer service, because it "provides or enables computer access by multiple users to a computer server" — in this case, to its servers containing the indexed database of postings. *See CLC v. craigslist,* 519 F.3d at 671 (treating craigslist as an "interactive computer service"); *Fair Housing Council,* 521 F.3d. at 1162, n. 6 ("Today, the most common interactive computer services are websites"); *Lycos, Inc.,* 478 F.3d at 419.

*Second,* the ads that are the subject of Plaintiff's claims clearly constitute "information" provided by "another information content provider" — *i.e.,* the users of craigslist. *See* Cmplt. at ¶¶ 33-34; *id.* at ¶ 32 (descriptions of postings disseminated via craigslist website). Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). There is no allegation (nor could there be) that craigslist created or developed the ads at issue. They were created and developed entirely by third parties — namely, the users who posted those ads. Such user-provided content is the paradigmatic example of information "provided by another information content provider." *See, e.g., Zeran,* 129 F.3d at 330-31; *Green,* 318 F.3d at 469.

Craigslist's designation of a subcategory for erotic ads does not alter this conclusion. Because there are lawful ads that can be (and are) placed in that subcategory (*e.g.,* massage and escort services), the mere provision of the category does not itself amount to being responsible for the creation or development of ads for unlawful activities created by users, especially given

that, as described above, craigslist has an express policy against posting of any such ads.[15]  *See*

*Whitney Information Network, Inc. v. Xcentric Ventures, LLC* 2008 WL 450095, *10 (M.D. Fla.

2008) ("the Court finds that the mere fact that Xcentric provides categories from which a poster

must make a selection in order to submit a report on the ROR website is not sufficient to treat

Defendants as information content providers of the reports about WIN that contain the 'con

artists', 'corrupt companies', and 'false TV advertisements' categories"); *Gentry v. eBay, Inc.*, 99

Cal.App.4th 816, 832 (2002) (holding that eBay's provision of product categories did not render

it responsible for ads created by users).

  *Third*, Plaintiff seeks to treat craigslist as a publisher of third-party content.  *See* Cmplt. at

¶¶ 11, 14, 28, 33-34, 43.  Indeed, as courts have explained, except for the few narrow (and

inapplicable) exceptions spelled out in Section 230 (*see infra* at fn 16), *any* lawsuit that would

impose liability on an interactive service provider for allegedly unlawful third-party information

necessarily seeks to impose liability on the service provider as the "publisher or speaker" of that

information.  *See, e.g., Zeran*, 129 F.3d at 328 ("§ 230 creates a federal immunity to *any cause of

action* that would make service providers liable for information originating with a third-party

user of the service"); *Carafano*, 339 F.3d at 1124 ("Under § 230(c), . . . so long as a third party

willingly provides the essential published content, the interactive service provider receives full

immunity regardless of the specific editing or selection process").  Holding craigslist liable for

the content of third-party postings would inevitably treat craigslist as a publisher because it

would (1) put craigslist in the posture of the original poster, who is the "publisher," and (2)

---

[15] Indeed, imposing liability on craigslist for its creation of an erotic subcategory also would run afoul of a different provision of Section 230 — namely, subsection 230(c)(2), which states that a provider cannot be held liable for "an action taken in good faith to restrict access to or availability of material that the provider or user considers to be 'lewd, lascivious . . . or otherwise objectionable.'"  As described above, *see supra* at 4-6, craigslist created this subcategory precisely to "restrict access to" adult or sexually oriented material by zoning it off so that users may block it or otherwise avoid viewing it.

subject craigslist to a legal regime in which it would have to review, edit, and/or screen third-party content — quintessential publishing functions. *Zeran*, 129 F.3d at 330, 333 ("lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content" necessarily "treats" the defendant as a "publisher" of that content and therefore "are barred"); *Green*, 318 F.3d at 471 (any claim that a service provider "promulgat[ed] harmful content" and "fail[ed] to address certain harmful content" pertains to "decisions relating to the monitoring, screening, and deletion of content from its network — actions quintessentially related to a publisher's role"); *Ben Ezra*, 206 F.3d at 986 ("Congress clearly enacted §230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions").

Plaintiff cannot escape this conclusion through artful pleading — such as by trying to impose liability on craigslist as a "public nuisance." Regardless of how he chooses to label his claim, Plaintiff seeks to hold craigslist liable for the content of the ads (which he claims solicit sex for money) that appeared on its website. As the Fifth Circuit in *Doe v. MySpace* held, plaintiffs' "allegations are merely another way of claiming that [the defendant] was liable for publishing the communications and they speak to [the defendant's] role as a publisher of online, third-party-generated content." 528 F.3d at 420. The Fifth Circuit rejected plaintiffs' efforts to plead around § 230 by contending that they were seeking to hold MySpace liable not for publishing, but for failing to implement protective measures:

> The Court . . . finds this artful pleading to be disingenuous. It is quite obvious the underlying basis of Plaintiffs' claims is that, through postings on MySpace, Pete Solis and Julie Doe met and exchanged personal information which eventually led to an in-person meeting and the sexual assault of Julie Doe. . . . No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities.

*Id.* at 419-20 (citation omitted). Likewise here, Plaintiff's claim is grounded in craigslist's alleged publication of the ads and its alleged failure to undertake measures such as screening, retraction or elimination of a subsection, that lie at the core of a publisher's functions. As courts have repeatedly held, "in determining whether to apply [§ 230], the Court should not ask what particular form the plaintiff's claim takes — whether it sounds in tort or specifically alleges defamation (if such were the case, plaintiffs could plead their way around [§ 230] and undermine the will of Congress) — but whether the claim is directed toward the defendant in its publishing, editorial, and/or screening capacities, and seeking to hold it 'liable for its publication of third-party content or harms flowing from the dissemination of that content.'" *Doe v. SexSearch.Com,* 502 F.Supp.2d 719, 727 (N.D. Ohio 2007), *aff'd on other grds.,* 551 F.3d 412 (6th Cir. 2008); *see also Zeran,* 129 F.3d at 332 (Section 230 bars claim notwithstanding plaintiff's "attempts to artfully plead his claims as ones of negligence"); *Lycos,* 478 F.3d at 418 ("[n]o amount of artful pleading" can avoid Section 230's bar).[16]

### C.     Permitting Plaintiff's Claims To Proceed Would Defeat the Two Public Policy Objectives of Section 230.

The important congressional policies behind Section 230 further confirm that Plaintiff's claims against craigslist should be dismissed. In enacting Section 230, Congress sought to encourage the development and vitality of the Internet and other interactive computer services by removing the specter of service provider liability for third-party speech. Congress declared:

---

[16]     The broad immunity afforded by Section 230 is confirmed by the statute's specific list of exceptions, which render the statute inapplicable in cases involving enforcement of federal criminal statutes, 47 U.S.C. § 230(e)(1), intellectual property law, *id.* at § 230(e)(2), or communications privacy law, *id. at* § 230(e)(4). The absence of any exception for State prostitution laws shows that Congress did not intend to exempt such laws from the statute's reach. *See Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.").

- it is "the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services," 47 U.S.C. § 230(b)(2);

- the Internet should be "unfettered by Federal or State regulation," *id.*;

- and the Internet has "flourished, to the benefit of all Americans, *with a minimum of government regulation*," 47 U.S.C. § 230(a)(3)-(4) (emphasis added).

In upholding the broad reach of Section 230 immunity, the courts have repeatedly recognized this congressional purpose to protect the vast public benefits the Internet provides. For example, the Ninth Circuit explained that "making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003). Given the "staggering" volume of third-party content that they carry, and "[f]aced with potential liability for each message republished by their services," *Zeran,* 129 F.3d at 331, such services likely would be forced, absent Section 230's protection, to restrict or abandon many of the features that enable the dissemination of third-party content in the first place. Thus, Section 230 was passed "to prevent lawsuits from shutting down websites and other services on the Internet." *Batzel,* 333 F.3d at 1028; *see also Zeran*, 129 F.3d at 330 (Congress enacted § 230 to promote "freedom of speech in the new and burgeoning Internet medium" by eliminating the "threat [of] tort-based lawsuits" against interactive services for injury caused by "the communications of others"); *Carafano,* 339 F.3d at 1122 (§ 230 "to promote the free exchange of information and ideas over the Internet").

A second purpose of Section 230 is to encourage self-regulation by eliminating disincentives to self-regulation that existed under the pre-Section 230 law. Congress recognized that service providers could play a constructive role by engaging in self-regulatory efforts to restrict availability of objectionable material in a manner that is appropriately tailored in light of the design of their services. As Representative Cox, a sponsor of the bill, explained:

"Government is going to get out of the way and let parents and individuals control [the Internet] rather than government doing that job for us." 141 Cong. Rec. 22,045 (1995). Congress sought to achieve this goal by "encourag[ing] interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material." *Batzel*, 333 F.3d at 1028; *see also Zeran*, 129 F.3d at 331 (Section 230 was intended "to encourage service providers to self-regulate the dissemination of offensive material over their services").

Congress achieved this goal by reducing pre-existing legal disincentives to voluntary self-regulation. Under traditional common law and First Amendment principles, an entity that intermediates the flow of substantial quantities of third-party content, such as a bookstore, news vendor, or online forum, may be held liable for that content only if it knew or should have known of the harmful content at issue. *See, e.g.*, *Smith v. California*, 361 U.S. 147, 152-53 (1959); *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 140 (S.D.N.Y. 1991). In the context of online media, however, Congress recognized that a legal regime in which liability depends on "notice" would perversely "reinforce[] service providers' incentives to . . . abstain from self-regulation," for fear of being held liable for anything a jury determines they should have uncovered — *i.e.*, "had reason to know" about — in the course of their efforts to monitor their services. *See Zeran*, 129 F.3d at 333 ("Any efforts by a service provider to investigate and screen material posted on its service would only lead to notice of potentially defamatory material more frequently and thereby create a stronger basis for liability"). Congress wanted to give service providers freedom to implement self-regulatory measures without fear that by doing so they would be exposing themselves to potential liability.

As described above, that is precisely what craigslist has done here. craigslist employs a number of self-regulatory measures in connection with the "erotic services" subcategory,

including the requirement of a payment via a valid credit card; the prominent display of warnings; a direction to users to flag as "prohibited" — and therefore for removal — any ad that a user believes violates the Terms of Use; and a mechanism to allow the use of widely available content-filtering technology to block this subcategory of ads. *See supra* at pp. 4-6 & fns 5-6. Absent the immunity provided by section 230, these mechanisms — especially the ability of users to flag potentially objectionable ads and the use optional filtering mechanisms — might trigger potential liability for craigslist by arguably giving it notice of unlawful content and, thus, craigslist would have a strong incentive not to provide such otherwise effective self-regulatory mechanisms. Congress passed Section 230 precisely to remove such disincentives.

## II.    Plaintiff's Proposed Remedies Are Barred as a Matter of Law.

Plaintiff's Complaint is also fatally defective, and must be dismissed, because all of the relief it seeks is unavailable as a matter of law. Plaintiff has requested monetary compensation, and an injunction closing down the erotic subcategory of the craigslist website. Cmplt. at p. 27. But Plaintiff would not be entitled to these remedies, even if he could otherwise prevail, because the costs his Department allegedly incurred in addressing the problems of prostitution in Cook County are not compensable tort injuries, and because his proposed injunction would constitute an invalid prior restraint. Plaintiff's claim must be dismissed because he has failed to allege "an actual injury that the Court can redress." *National Ass'n of Realtors v. National Real Estate Ass'n*, 894 F.2d 937, 940 (7th Cir. 1990).

### A.    Plaintiff's Expenditure of Costs Is Not a Tort Injury That Can Be Redressed with Damages.

Plaintiff has requested monetary relief in the form of compensatory and punitive damages, as well as "the costs incurred in abating the nuisance." Cmplt. at p. 27. Plaintiff points specifically to $105,081 in costs associated with certain arrests, as well as "additional costs" for

prosecution and health care services. *Id.* at ¶¶ 139-41. This relief is not available as a matter of law because Plaintiff's costs are economic losses rather than compensable tort injuries and, separately, because they are the costs of providing basic municipal services.

The Illinois Supreme Court recently clarified the limits on the state-law tort of public nuisance in *City of Chicago v. Beretta USA*, 821 N.E.2d 1099, 1140-43 (Ill. 2004). In that case, the City of Chicago alleged that gun manufacturers, distributors and dealers had facilitated a black-market gun trade that perpetuated violence and crime. The City alleged the defendants' practices interfered with City residents' "common right to be free from conduct that creates an unreasonable jeopardy to the public's health, welfare and safety," and a "danger to person or property." *Id.* at 1108-1109. The City sought recovery of the costs of law enforcement, medical services, criminal prosecutions and other related expenses. *Id.* at 1106.

The Illinois Supreme Court rejected the City's claims, and one of its many grounds for doing so was the absence of available remedies. *See id.* at 1140-1146. The court concluded that the City could not recover its expenses because they were barred by the doctrines against recovery of economic losses and recovery of municipal costs. The essence of both doctrines, as applied to the City's case, was that the City did not have an injury that could be compensated by a common-law tort suit. These same doctrines apply here, and each independently bars Plaintiff's ability to seek monetary relief.

### 1. Plaintiff's Costs Are Solely Economic Losses.

The tort-law rule against economic losses holds that a plaintiff in a tort action may recover only for personal injury or property damage, plus any associated costs. *In re Illinois Bell Switching Station Litig.*, 641 N.E.2d 440, 443-44 (Ill. 1994). A plaintiff may not recover purely "economic" damages in tort. *In re Chicago Flood Litigation*, 680 N.E.2d 265. 274-76 (Ill. 1997)

(plaintiffs who did not allege property damage from Chicago River flood could not state claim for monetary relief for lost wages and other costs associated with evacuation of buildings).

The Illinois economic loss doctrine plays an important limiting role in nuisance actions, where a defendant would otherwise face open-ended tort liability to any person, however remotely affected by its conduct. *See Beretta*, 821 N.E.2d at 1140, 1143; *Chicago Flood*, 680 N.E.2d at 274 (describing potential liability as "virtually limitless"). In the gun manufacturer litigation, the City could not state a claim for damages because it sought relief for the costs of providing services to its citizens but had not alleged "physical harm to city property or other direct injury." *Beretta*, 821 N.E.2d at 1143. This case is identical to *Beretta* in all key respects. Plaintiff seeks compensation for the costs of providing law-enforcement and public health services but has not alleged that the County has suffered any property damage or other direct injury compensable in tort. *Beretta* dictates that these "damages" are in fact purely economic losses for which Plaintiff cannot recover monetary relief.

## 2.    Plaintiff's Costs Are Expenditures on Municipal Services.

Dismissal of the City's nuisance claim in *Beretta* was also "mandated" by the rule against recovery of municipal costs. *Beretta*, 821 N.E.2d at 1144. Under this principle, a public entity may not seek monetary relief for "public expenditures made in the performance of governmental functions." *Id.* The rationale for this rule is that the costs of government services are allocated to the community as a whole through the tax system, in a manner established by a legislature. *Id.* at 1145. In *Beretta*, the court held that the City could not recover its gun-related costs because the existing system of tax-funded police and public health services had pre-allocated the very costs that were the object of the suit. *Id.* at 1147. Here, as in *Beretta*, Plaintiff seeks compensation for costs that are allocated to *all* County residents by the existing tax system.

Plaintiff asks the Court to legislate from the bench an additional tax on craigslist, and by extension any entity deemed to have played some part in the commission of the alleged criminal acts, however remote. That result is untenable. *See Beretta*, 821 N.E.2d at 114 (alluding to "significant unintended consequences" of such a theory).[17]

### B.     The Requested Injunction Would Be an Unconstitutional Prior Restraint.

Plaintiff also seeks to "close" the erotic subcategory of the craigslist website. Cmplt. at ¶ 2. But the Court cannot award such relief because it would constitute an invalid prior restraint on speech in violation of the First Amendment to the U.S. Constitution.[18]

A prior restraint exists when the law gives "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002). Permanent injunctions that forbid speech activities are "classic examples" of prior restraints. *Alexander v. United States*, 509 U.S. 544, 550 (1993). The injunction requested here falls into this category.

Prior restraints are "highly disfavored" and "presumed invalid" under the First Amendment. *Weinberg*, 310 F.3d at 1045; *see Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). The imposition of a prior restraint is permitted only in "exceptional cases," where the harm from disclosure "is both great and certain and cannot be mitigated by less intrusive measures." *CBS v. Davis*, 510 U.S. 1315, 1317 (1994) (quoting *Near v. Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931) and *Nebraska Press Assoc. v. Stuart*, 427 U. S. 539, 562 (1976)). This strict scrutiny applies "even where questions of allegedly urgent national security

---

[17]     Plaintiff's nuisance claim is also defective on other grounds but due to space constraints we do not address them here. As Judge Easterbrook recognized in rejecting a nuisance claim against an Internet service provider, "the ability to misuse a service that provides substantial benefits to the great majority of its customers does not turn that service into a 'public nuisance.'" *Doe v GTE*, 347 F.3d 655, 662 (7th Cir. 2003). *See also Beretta*, 821 N.E.2d at 407-11 (dismissing nuisance claim for lack of causation; "legal cause will not be found where the criminal acts of third parties have broken the causal connection").

[18]     Such relief also would violate Article I, Section 4 of the Illinois Constitution.

or competing constitutional interests are concerned." *Id.* (citing *New York Times Co. v. U.S.*, 403 U. S. 713 (1971) (per curiam) and *Nebraska Press Assoc.*, 427 U. S. at 559). The Supreme Court has recognized only one situation where a prior restraint on otherwise protected speech would be permissible: a wartime ban on speech that would impede military recruitment efforts or publicize troop movements. *See Near*, 283 U.S. at 716 (in dicta); *compare New York Times*, 403 U.S. at 714 (denying injunction against publication of classified study on efforts in Vietnam during war).

The injunction requested here falls far short of this very high bar. First, even assuming for the sake of argument that craigslist's erotic subcategory were a public nuisance, that would not indicate an "exceptional" circumstance warranting intervention. *See Near*, 283 U.S. at 720 ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint"); *Collins v. Jordan*, 110 F.3d 1363, 1371-1372 (9th Cir. 1996) ("The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct").

Plaintiff has also failed to rule out, as he must, the existence of less rights-intrusive measures to protect County residents. *CBS*, 510 U.S. at 1317. Nor can Plaintiff establish that the injunction he seeks would be at all effective in providing such protection. *See Nebraska Press Ass'n*, 427 U.S. at 565-566 (rejecting restraint on trial reporting as unrealistic after inquiring into its "probable efficacy"). Indeed, common sense suggests that closing the erotic subcategory, where special warnings and tracing measures are deployed, would only increase the likelihood that wrongdoers will abuse craigslist's service without detection by law enforcement and that ads soliciting prostitution will crop up on other craigslist categories instead or on other websites altogether. No allegation in the Complaint undermines these predictions.

Although the Internet may pose novel questions in First Amendment law, the prior restraint doctrine translates cleanly into this context, and particularly to this case. That the injunction sought by Plaintiff would be an invalid prior restraint is clear in comparison to the statute at issue in *Center for Democracy & Technology v. Pappert*, which struck down Pennsylvania's Internet Child Pornography Act. 337 F. Supp. 2d 606, 657-58 (E.D. Pa. 2004). That statute required Internet service providers to block access to web sites identified as containing child pornography. The statute operated as an unconstitutional prior restraint, because it "prevents future content from being displayed [at a web address] based on the fact that the [web address] contained illegal content in the past." *Id.* The restraint sought here would be unconstitutional for the same reasons, but unlike the *CDT* suit, which involved the nuances of "blocking" technology, the injunction sought here more closely resembles an outright ban on an entire category of future speech. *See Near*, 283 U.S. 697; *see also Reno v. Amer. Civil Liberties Union,* 521 U.S. 844, 870 (1997) (First Amendment protections apply with full force to Internet).

## CONCLUSION

For the foregoing reasons, this Court should, as a matter of law, grant craigslist's motion for judgment on the pleadings and enter judgment dismissing Plaintiff's claims with prejudice.

Respectfully submitted,

CRAIGSLIST, INC.

May 4, 2009                    By: _____ s/ Eric D. Brandfonbrener _____

Eric D. Brandfonbrener
Kathleen A. Stetsko
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400

Patrick J. Carome
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 663-6000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May 4, 2009, he caused a true and correct copy of CRAIGSLIST'S MOTION TO DISMISS and supporting MEMORANDUM to be served through the Court's electronic system on:

Daniel F. Gallagher
Paul O'Grady
Christopher P. Keleher
Querrey & Harrow, Ltd.
Suite 1600
175 W. Jackson Blvd.
Chicago, Illinois 60604


_____ _____ s/ Eric D. Brandfonbrener__